

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

September 21, 2007

**BY HAND**

The Honorable Colleen McMahon
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1940
New York, New York 10007

Re:    **United States v. Rahim Frazier, 07 Cr. 686 (CM)**

Dear Judge McMahon:

      The Government respectfully submits this letter in response to the defendant's motion, dated September 7, 2007, to suppress post-arrest statements and physical evidence recovered by officers of the New York City Police Department ("NYPD") in connection with the defendant's arrest on April 8, 2007, for possession of a firearm.  Based on the defendant's declaration and the uncontested facts set forth in a Complaint in this case, the Government does not believe that a hearing is necessary.  The uncontested facts show that the NYPD officers had reasonable suspicion to stop the defendant, to pat him down, and to do a protective weapons sweep of the laundry bag in the defendant's possession, for their own safety and the safety of others.

## BACKGROUND

### I.    Procedural Background

      A Complaint charging the defendant with violating Title 18, United States Code, Section 922(g), was signed by Magistrate Judge Theodore H. Katz on July 9, 2007.  See Complaint, 07 Mag. 1091 (attached as Exhibit A hereto).  On July 10, 2007, a Writ of Habeas Corpus Ad Prosequendum was obtained to writ the defendant from state to federal custody.  The defendant was ordered detained by Magistrate Judge Katz after being presented on July 11, 2007.

The Honorable Colleen McMahon
September 21, 2007
Page 2

The defendant was indicted on the same charge on July 25, 2007.

**II.    Factual Background**

On or about April 8, 2007, four uniformed police officers responded to a 911 call made at approximately 3:31 a.m. by a complainant in a domestic dispute. See Complaint ¶ 2(b). The radio dispatch reported that the complainant lived on the fourth floor, in Apartment 4C, of the building located at 2675 Valentine Avenue in the Bronx. Id. ¶ 2(a). The radio dispatch further indicated that there was a male armed with a gun, dressed in a black jacket with a "grey hoody," and wearing a "red durag" (a bandana). Id. The dispatch also provided the complainant's name and telephone numbers, information the complainant had provided on the 911 call to the police. See Exhibit B attached hereto (a copy of the sprint printout of the radio dispatch).[1]

The officers entered the building within minutes of the radio dispatch and climbed the narrow staircase towards the fourth floor. Complaint ¶ 2(b). They observed a male, the defendant, dressed in a black jacket with a grey hood and wearing a red bandana on his head, walking down the stairs between the third and fourth floors of the building. He was carrying a laundry bag with draw strings over his shoulder. Id. The police officers stopped the defendant on the third floor landing, and questioned him. Id. The defendant stated that he had come from Apartment 4C. Id. The defendant was patted down and the laundry bag was placed on the floor next to him, where it was within his reach.[2]

Two of the officers stayed with the defendant on the third floor landing while two of the officers went up to the fourth floor to speak with the complainant. Id. ¶ 2(c). The complainant told the two officers who went to the fourth floor that she had had a dispute with her baby's father, and that he had taken a gun from the closet and put it in a laundry bag. Id. Upon learning this, the two officers who had just spoken with the complainant went back down the stairs to where the defendant was being detained. One of the officers opened the laundry bag and found the gun inside it. Id. ¶ 2(d). The defendant was then handcuffed and taken to the station. Id. The entire time that elapsed between the time the first officers arrived out the front of the building (at 3:33 a.m.) and the time the defendant was handcuffed, was between five and seven minutes. See Exh. B.

---

[1]The printout was provided by the Government in discovery. Note that the code "52" on the printout means a dispute. "ML" means "male."

[2]The defendant admits that he was patted down. See Decl. of Rahim Frazier at ¶ 10 (Sept. 6, 2007). The fact that the laundry bag was placed on the floor next to the defendant and within his reach would be established at hearing if the Court were to decide a hearing is necessary.

The Honorable Colleen McMahon
September 21, 2007
Page 3

At the station, the defendant was read his Miranda rights.  After signing a form affirmatively indicating that he understood those rights, the defendant stated that he found the gun in a park approximately one and half years ago.  Id. ¶ 2(e).

**ARGUMENT**

Fourth Amendment law recognizes three types of interactions between government agents and private citizens: (i) consensual encounters, which require no justification; (ii) investigative detentions, which require "reasonable suspicion" to believe that criminal activity has occurred or is about to occur; and (iii) arrests, which require a showing of probable cause.  United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995); United States v. Hooper, 935 F.2d 484, 490 (2d Cir. 1991).

The defendant argues that the search of his laundry bag was unlawful because the defendant did not consent to the search of the laundry bag and because the search preceded the defendant's arrest.  The Government concedes that this is not a consensual search.  The Government's position is that the search was lawful under the Fourth Amendment because it was a protective sweep for weapons during an investigative stop under Terry v. Ohio, 392 U.S. 1 (1968).[3]

---

[3] The defendant argues that the search cannot be lawful as incident to an arrest because the search preceded the arrest, relying on Smith v. Ohio, 494 U.S. 541 (1990).  The Government does not address this point because the search is clearly lawful as a protective sweep on a Terry stop.  However, the Government notes that if the police had probable cause to arrest the defendant at the time of the search, the search was lawful even if defendant is not formally arrested until later.  See, e.g., Rawlings v. Kentucky, 448 U.S. 98 (1980) (holding that it was not "particularly important that the search preceded the arrest" when the police had probable cause to arrest the defendant before the search and "the formal arrest followed quickly on the heels fo the challenged search"); U.S. v. Han, 74 F.3d 537, 541 (4th Cir. 1996) (search of defendant's bag immediately before formal arrest valid because police had probable cause to arrest the defendant before search based on informant's description and officers' observation of suspect).  Further, under Chimel v. California, 395 U.S. 752, 762-63 (1969), police may conduct a "search of the arrestee's person and the area 'within his immediate control'- construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence."  See also United States v. Hernandez, 941 F.2d 133 (2d Cir. 1991) (referring to area within immediate control as the "grab area") (holding that search of the edge of a mattress of a bed where the officer found a gun after handcuffing the detainee was lawful).

The Honorable Colleen McMahon
September 21, 2007
Page 4


I.      **Applicable law**

        A police officer may conduct a brief "investigative detention" or "Terry stop" by stopping a person to investigate possible criminal behavior, as long as at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." Tehrani, 49 F.3d at 58 (citing United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992)); see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) (same).  Reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

        "Reasonable suspicion" is measured by an objective test, Glover, 957 F.2d at 1010, and reviewing the circumstances as a whole, not as discrete and separate facts, United States v. Barlin, 686 F.2d 81, 86 (2d Cir. 1982).  In assessing whether an officer's suspicion was objectively reasonable, a court must consider the "totality of the circumstances." United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000).  In that analysis, factors that by themselves suggest innocent conduct may add up to reasonable suspicion when viewed as a whole.  See United States v. Arvizu, 534 U.S. 266, 274-75 (2002); see also United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) ("Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.").

        After stopping a suspect pursuant to reasonable suspicion, an officer is permitted to conduct a protective search for weapons if the officer has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. 1, 27 (1968).  The officer need not be absolutely certain that the suspect is armed; but rather, may conduct the protective search if a reasonably prudent man in the officer's position "would be warranted in the belief that his safety or that of others was in danger." Id.; see also United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."); McCardle v. Addad, 131 F.3d 43, 48 (2d Cir. 1997) (same).


II.     **Discussion**

        A.      The Officers Had Reasonable Suspicion to Stop
                the Defendant on the Third Floor Landing

        The following facts demonstrate that the officers had reasonable suspicion to stop the defendant on the third floor landing when they saw him as they were climbing the stairs of

The Honorable Colleen McMahon
September 21, 2007
Page 5


2675 Valentine Avenue.

First, the defendant's clothing matched the description given in the 911 call.  The radio dispatch described the suspect as a male  armed with a gun, dressed in a black jacket with a grey hood, and wearing a red bandana.   The defendant was wearing a black jacket with a grey hood, and a red bandana.  Further, since the officers responded to the 911 call within minutes of receiving the radio dispatch, and it was in the middle of the night, it was highly unlikely that there would be another person in the building wearing clothes matching the description on the 911 call.

Second, when the officers first saw the defendant, he was coming down the stairs from the fourth floor, and he admitted he was coming from Apartment 4C.  The radio dispatch indicated that the 911 caller identified herself as living in Apartment 4C on the fourth floor.

Third, the complainant had identified herself by name in the 911 call, and during the call provided two telephone numbers to the police.  She confirmed the 911 report of a domestic dispute with a man with a gun when the two officers spoke to her in person on the fourth floor of 2675 Valentine Avenue, where she lived.  Thus, the police were not relying on an anonymous tipster.  See United States v. Walker, 7 F.3d 26, 30 (2d Cir. 1993)  ("A] face-to-face informant must . . . be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false.") (quoting United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991)).

Under the "totality of the circumstances," therefore, the officers reasonably believed the defendant had been in a domestic dispute and was carrying a gun.

> B.    The Subsequent Search of the Laundry Bag Was Lawful
>        Because it Was Protective Sweep for Weapons

While two of the officers remained with the defendant on the third floor landing, two officers climbed the stairs to the fourth floor to speak to the complainant.[4]  The complainant told these two officers that the defendant had taken a gun out of the closet and put it into a laundry bag.  Since the officers had seen the defendant carrying a laundry bag, they had reason to be concerned for their own safety and the safety of the officers who were guarding the defendant. That the defendant could have retrieved the gun from the laundry bag posed a danger justifying

---

[4]One of the officers who stayed behind with the defendant on the third floor landing recalls retrieving the gun from the laundry bag after patting the defendant down, before the two officers who went upstairs returned.  Whether this officer retrieved the gun, or one of the officers who went upstairs retrieved the gun is immaterial: in either case the gun was retrieved for the safety of the officers, and they had reasonable belief that the defendant posed a danger to them.

The Honorable Colleen McMahon
September 21, 2007
Page 6

the protective search. <u>Michigan</u> v. <u>Long</u>, 463 U.S. 1033, 1049-50 (1983) ("protection of police
and others can justify protective searches when police have a reasonable belief that the suspect
poses a danger") (holding that a search of passenger compartment of a car did not exceed scope
of <u>Terry</u> stop because it was limited to areas where a weapon could be placed or hidden and the
officers reasonably believed the suspect was dangerous); <u>United States</u> v. <u>Atlas</u>, 94 F.3d 447, 451
(8th Cir. 1996) (search of duffel bag for weapons reasonable where police reasonably suspected
there was a weapon inside it).

### III.    Conclusion

The search of the defendant's laundry bag was clearly justified as protective search during
a <u>Terry</u> stop based on the officers' reasonable belief that the defendant posed a danger.
Accordingly, both the gun and the defendant's post arrest statements are admissible and the
defendant's suppression motion should be denied without a hearing.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    _Antonia Apps_

Antonia M. Apps
Assistant United States Attorney
(212) 637-2198 (phone)
(212) 637-2527 (fax)

cc:    Steven M. Statsinger, Esq.