UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────── x

UNITED STATES OF AMERICA,

    -against-                                          07 Cr. 686 (CM)

RAHIM FRAZIER,

             Defendants.
──────────────────────────────── x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/22/07

## ORDER DENYING DEFENDANT'S SUPPRESSION MOTION

McMahon, J.:

    Defendant is charged in the present indictment with possession of a firearm as a previously convicted felon, in violation of Title 18, United States Code, Section 922(g). Defendant has filed a motion pursuant to Rules 12 and 41 of the Federal Rules of Criminal Procedure, to suppress the seizure of the gun and his subsequent statements to law enforcement, on the ground that the search that uncovered the gun violated the Fourth Amendment to the United States Constitution.

### Facts

    The facts and circumstances of the defendant's arrest are recounted here from the criminal complaint filed by the Government: On or about April 8, 2007, four uniformed police officers responded to a 911 call made at approximately 3:31 a.m. by a complainant in a domestic dispute. See Complaint ¶ 2(b). The radio dispatch reported that the complainant lived on the fourth floor, in Apartment 4C, of the building located at 2675 Valentine Avenue in the Bronx. Id. ¶ 2(a). The radio dispatch further indicated that one of the persons involved, a male, armed with a gun, dressed in a black jacket with a "grey hoody," and wearing a "red durag" (a bandana). Id. The dispatch also provided the complainant's name and telephone numbers, information the complainant had provided on the 911 call to the police. (See Sprint printout of the radio dispatch).

    The officers entered the building within minutes of the radio dispatch and climbed the narrow staircase towards the fourth floor. Complaint ¶ 2(b). They observed a male, the defendant, dressed in a black jacket with a grey hood and wearing a red bandana on his head, walking down the stairs between the third and fourth floors of the building. He was carrying a laundry bag with draw strings over his shoulder. Id. The police officers stopped the defendant on the third floor landing, and questioned him. Id. The defendant stated that he had come from Apartment 4C. Id. The defendant was patted down and the laundry bag was placed on the floor next to him, where it was within his reach.

    Two of the officers stayed with the defendant on the third floor landing while two of the

officers went up to the fourth floor to speak with the complainant. Id. ¶ 2(c). The complainant told the two officers who went to the fourth floor that she had had a dispute with her baby's father, and that he had taken a gun from the closet and put it in a laundry bag. Id. Upon learning this, the two officers who had just spoken with the complainant went back down the stairs to where the defendant was being detained. One of the officers opened the laundry bag and found the gun inside it. Id. ¶ 2(d). With regard to when the gun was recovered and actually who recovered it, the Government suggests in a footnote in its brief that the police officers who remained with the defendant may have uncovered the gun before the officers who went up stairs returned. "One of the officers who stayed behind with the defendant on the third floor landing recalls retrieving the gun from the laundry bag after patting the defendant down, before the two officers who went upstairs returned." (Gov't Br. at 5, n.4).

In any event, defendant was handcuffed and taken to the station within five to seven minutes from the beginning of the encounter. At the station, the defendant was read his Miranda rights. After signing a form affirmatively indicating that he understood those rights, the defendant stated that he found the gun in a park approximately one and half years ago. Id. ¶ 2(e).

Notwithstanding the Government's apparent uncertainty about who found the gun, defendant does not quibble with the Government's rendition of the facts and states in his reply memorandum that, "Since there are no facts in dispute, no hearing is necessary in this case." (Def. Reply at 2). And so, the Court will decide the instant motion based on the facts stated above. I resolve the disparity in the Government's story about who found the gun and when, in favor of the officer who says he remembers recovering the gun from the bag before his fellow officers returned from upstairs. There would be no reason for the officer to volunteer such information if it were not true.

Defendant's Motion

The defendant argues that the search of his laundry bag was unlawful because the defendant did not consent to the search of the laundry bag and because the search preceded the defendant's arrest. The Government concedes that this is not a consensual search. The Government's position is that the search was lawful under the Fourth Amendment because it was a protective sweep for weapons during an investigative stop under Terry v. Ohio, 392 U.S. 1 (1968).[1]

---

[1] In a footnote to its brief, the Government suggests, but does not specifically argue, an alternative basis for upholding the search: "The Government notes that if the police had probable cause to arrest the defendant at the time of the search, the search was lawful even if the defendant is not formally arrested until later." (Gov't Letter Br. at 3, n.3). This argument is a non-starter because the police clearly did not have probable cause to arrest defendant until after they recovered the gun. There is no indication from the evidence presented that the police had probable cause to arrest defendant in connection with the domestic dispute or for any other reason, before they recovered the gun. It is no wonder the Government – always belt and suspenders – did not pursue this tack.

The justification for a Terry search "is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. A police officer may conduct a brief "investigative detention" or "Terry stop" by stopping a person to investigate possible criminal behavior, as long as at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." Tehrani, 49 F.3d at 58 (citing United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992)); see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) (same). Reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

"Reasonable suspicion" is measured by an objective test, Glover, 957 F.2d at 1010, and reviewing the circumstances as a whole, not as discrete and separate facts, United States v. Barlin, 686 F.2d 81, 86 (2d Cir. 1982). In assessing whether an officer's suspicion was objectively reasonable, a court must consider the "totality of the circumstances." United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000). In that analysis, factors that by themselves suggest innocent conduct may add up to reasonable suspicion when viewed as a whole. See United States v. Arvizu, 534 U.S. 266, 274-75 (2002); see also United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991).

After stopping a suspect pursuant to reasonable suspicion, an officer is permitted to conduct a protective search for weapons if the officer has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. 1, 27 (1968). "It is reasonable to conclude that such an intrusion, in addition to a frisk of the person, would ordinarily include 'the area " within his immediate control "'-construing that phrase to mean the area from within which (the person being searched) might gain possession of a weapon ..." United States v. Johnson, 637 F.2d at 535 (8th Cir. 1980) (quoting from Chimel v. California, 395 U.S. 752, 763 (1969)).

In the present case, under the "totality of the circumstances," it was reasonable for the police officers to believe that the defendant had been in a domestic dispute and was carrying a gun. Indeed, defendant does not dispute that the police had reasonable suspicion justifying a Terry stop. Defendant argues, however, that the scope of the search – the search of the duffle bag – exceeded that which is permissible under Terry and its progeny.

Thus, the question presented: Was the search of the laundry bag within the bounds of a lawful Terry stop?

The Government's position is that since defendant could have retrieved the gun from the laundry bag a search of the bag was justified as part of a protective search. The Government cites Michigan v. Long, 463 U.S. 1033, 1049-50 (1983) and United States v. Atlas, 94 F.3d 447, 451 (8th Cir. 1996), in support of its position.

3

Long is not particularly helpful here because it applies Terry to the unique circumstances of a traffic stop. In justifying the warrantless search of a container within the vehicle, the Long Court held that:

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Long, 463 U.S. at 1049. Indeed, the Supreme Court has long held that there is "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Carroll v. United States, 267 U.S. 132, 153 (1925). Where police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages, that may conceal the object of the search. United States v. Ross, 456 U.S. 798, 815-25 (1982). Accordingly, Long is of little value to the Court's analysis of the present search.

In Atlas, officers were approaching a house, where they were called to assist in a "retrieval of property call" (A retrieval of property call involves a party to a past domestic dispute obtaining police oversight of that person's recovery of personal belongings from a dwelling after that person has been excluded, usually pursuant to a domestic arrest). As officers approached the property, an Officer Reimer saw Atlas standing on the house porch. As the two made eye contact, Officer Reimer saw that Atlas's eyes "got big." The Officer saw Atlas drop a soft nylon bag, which made a "thud" when the bag hit the ground. Officer Reimer asked Atlas what was in the bag. When asked about the contents of the bag Atlas responded, "Oh, oh nothing." Atlas appeared "real nervous" and continually shifted his gaze between the bag and the officer. Officer Reimer told Atlas to place his hands on the wall for a pat search. He asked Atlas if the bag was his, to which Atlas said "no." Officer Reimer then began to pat search Atlas for weapons.

Officer Reimer told fellow Officer McDonald to check the bag. Officer McDonald touched the bag, and felt the barrel of what he thought was a shotgun. When McDonald advised Officer Reimer that there was a shotgun in the bag, Atlas began to resist and fight Officer Reimer. After the two officers finally succeeded in handcuffing Atlas, they opened the bag and found a loaded, bolt-action rifle with a sawed-off barrel, plus a round of ammunition and items relating to a local gang. Atlas was arrested on weapons and other charges. The Eighth Circuit upheld the search under Terry.

While Atlas helps inform the discussion here, it is, in the end, distinguishable from the case at bar because, unlike the search in the present case, the Atlas officer patted down the bag and discerned the outline of a gun before opening the bag and retrieving the weapon. Furthermore,

defendant's claim on appeal in Atlas was not that officers needed a warrant to search his bag, but rather, that they lacked reasonable suspicion in the first place. The Eighth Circuit's analysis of the case was solely whether reasonable suspicion existed. Id. at 450-51.

Citing *inter alia* the Second Circuit's opinion in U.S. v. Rogers, 129 F.3d 76 (1997), defendant argues that police are never permitted to search a suspect's bag during a Terry stop unless an officer first performs a pat-down search of the bag and feels the contours of a weapon. In Rogers, the police stopped a cab that had flashed its lights in apparent distress and questioned the passengers. During the questioning, the defendant reached inside her coat. The officer then grabbed the coat to feel for weapons, and felt a "hard object" and a "soft object" inside a paper bag. The officer was not certain that the objects were not weapons, nor was he certain they were contraband. He looked in the paper bag and found cocaine. The lower court determined, and Second Circuit agreed, that, "probable cause to believe that contraband was present arose when [the officer], acting within the bounds of a protective pat-down search, grabbed the object in Rogers' pocket, manipulated it for a few seconds, and concluded that it was probably drugs. The incriminating character of the object was therefore 'immediately apparent.'"
Id. at 80.

Thus, the question presented is refined: Are there circumstance that permit police to open a suspects bag during the course of a Terry search without first patting that bag down?

In United States v. Johnson, 637 F.2d 532 (8th Cir. 1980), the court upheld the admissibility of a sawed-off shotgun found in the course of a Terry search. At the time of the search, a duffle bag was three or four feet from the suspect. Id. at 535. A cloth-covered object protruded from the top of it. Id. at 533. One police officer patted down the suspect, while another grabbed the cloth covered object, which he believed to be a gun. Id. Removing the cloth, he found the stock of a weapon. Id. He then withdrew it from the duffle bag. Id. at 534. The court concluded that the seizure of the gun was justified under Terry. Id. at 535. The court relied on the accessibility of the weapon to the suspect and the limited nature of the intrusion. Id. It noted that the officer "did not conduct a general exploratory search for whatever evidence of criminal activity he might find." Id. Of course, in the case at bar, there was nothing protruding from the bag. It is unclear whether the Eighth Circuit would have upheld the search in Johnson, absent testimony about a protruding cloth.

In United States v. Barlin, 686 F.2d 81 (2d Cir. 1982), defendant Fantauzzi entered an apartment along with alleged coconspirators while federal agents were doing an inventory of the apartment after arresting other coconspirators. Id. at 85. She was immediately ordered against the wall, patted down and asked to expose her waistband. Id. About 15 minutes later, the agents noticed Fantauzzi's handbag about fifteen to twenty feet from her. Id. at 86, 87. An agent searched the bag and discovered cash and cocaine. Id. at 86. The Second Circuit ruled that the search of the handbag was within the scope of Terry. Id. at 86-87. The court noted that the agents were without handcuffs and had no way to neutralize the suspects until they finished their search. Id. at 87. It further noted the high likelihood that a woman would keep a weapon in a handbag. Id. The court also rejected the

argument that the passage of time undermined the reasonableness of the search. The Court reasoned:

> It would have been unwise for the agents who lacked handcuffs and had other work to do simply to have handed Fantauzzi her bag and released her or to have left the bag unsearched. So long as the purse remained unopened, it was a source of danger to the agents and to the suspects as well, whose innocent or unintended gesture in the direction of the bag might have resulted in calamitous consequences. We need not wait for such a tragedy to occur to appreciate the unrealistic nature of Fantauzzi's argument. *The rule of minimal intrusion permits whatever efforts are necessary to neutralize a potentially explosive and fatal situation.* The steps taken here were well within the permissible range.

Id. at 87 (emphasis added).

While the facts in Barlin are distinguishable from those in the present case, the analysis applied by the Circuit in that case frames the ultimate question for this Court: Was the intrusion into Frazier's bag necessary to neutralize a potentially explosive and fatal situation?

The answer is: Yes.

The police officers were dispatched to handle a domestic dispute on the fourth floor of 2675 Valentine Avenue. The radio call informed the officers that there was a male, *armed with a gun*, dressed in a black jacket with a "grey hoody" and wearing a "red durag." Id. The dispatch provided the complainant's name, apartment number and telephone number. When the officers arrived at the building, they climbed the narrow stairs and observed a man in a black jacket with a grey hood and wearing a red bandana on his head, walking down the stairs between the third and fourth floors. At that point, the officers had reasonable suspicion that they had encountered the "man with the gun" and a reasonable belief that it was necessary to search that man for the gun, and anything within his reach, in order to neutralize a potentially explosive and fatal situation. See Barlin, 686 F.2d at 87. To require the officers to massage and grope blindly at a laundry bag, which might well have contained a loaded weapon – itself a potentially fatal exercise – flies in the face of the rationale behind Terry: "The protection of the police officer and others nearby." See Terry v. Ohio, 392 U.S. at 29. Indeed, leaving the unsearched bag next to the defendant in the confined stairway presented a danger to defendant as well: if defendant made a gesture – intended or unintended – in the direction of the bag, it might have resulted in calamitous consequences. Under the facts of this case, it was lawful for the officer to look inside the bag for a gun without first putting the bag down.

Even if this Court were mistaken in its belief that the officer who first retrieved the gun had a reasonable belief to check the laundry bag for a gun, suppression would still not be warranted, because the gun would have been inevitably discovered after the other two officers went to the fourth floor to speak with the complainant. The complainant told these officers that defendant had put the gun in the laundry bag. Her information gave the officers more than reasonable belief to search the

6

bag for a gun, so its discovery was inevitable. While the Court does not believe <u>Terry</u> required the officer who initially encountered defendant to "feel" the bag before checking it for a weapon, it certainly cannot be the case that the officers who were told by the complainant that "the gun was in the bag" had to feel the contours of the bag in order to acquire a reasonable belief that it contained a weapon.

Accordingly, both the gun and the defendant's post arrest statements are admissible and defendant's suppression is denied without a hearing.

This constitutes the decision and order of the Court.

October 19, 2007

_____
Colleen McMahon
U.S.D.J.